# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin

In the Matter of the Search of:

Information between January 1, 2016 and the present date associated with the Facebook accounts "Marcel M Wilson" - ID# 100000134569181 and "Marcus Wilson" - ID# 100012559444427, that are stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.

)
)
)
)
)
)

Case No. 19-M-107

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

   See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

   See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: 18 U.S.C. §§ 844(i), 1001, 1512 and 26 U.S.C. § 5861(d), (e) and (f).

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

ATF Special Agent Rick Hankins
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: Apr 30, 2019

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

Hon. David E. Jones _____, U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent Rick Hankins, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook, a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      I am a Special Agent of the United States Justice Department, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), currently assigned to the Milwaukee Field Office. I have been so employed since April 2003. My duties as a Special Agent with ATF include investigating alleged violations of the federal firearms, explosives, and arson statutes.

3.      I have completed approximately 26 weeks of training at the Federal Law Enforcement Training Center (Glynco, Georgia), as well as the ATF National Academy. That training included various legal courses related to Constitutional Law as well as

search and seizure authority. Additionally, I have received training on how to conduct various tasks associated with criminal investigations, such as: interviewing, surveillance, and evidence collection.

4.     In addition to my duties as a criminal investigator, I am also an ATF Certified Fire Investigator (CFI). As an ATF CFI, I am tasked with providing expert opinions as to the origin and cause of fires. I obtained the ATF CFI certification in 2009 following a two-year training program that centered on various fire science topics including, but not limited to: chemistry, fire dynamics, and building construction. The two-year ATF CFI certification program consisted of college courses, written exams, research papers, reading assignments, practical training exercises, and test burns of various materials. I am re-certified annually as an ATF CFI. To date, I have participated in over 260 fire scene examinations and have testified as an expert. Additionally, I have been certified as a fire investigator by the International Association of Arson Investigators since June 2011. I have received over 1,300 class hours of fire related training. Furthermore, I have been an instructor regarding fire related topics on numerous occasions for the following agencies and institutions: The National Fire Academy (FEMA), International Association of Arson Investigators Chapter 25, Waukesha County Technical College, and Blackhawk Technical College. I have also participated in over 190 live fire training exercises, where I started training fires and observed fire growth and development. Finally, I was a full-time instructor at the ATF National Academy from August 2015 – August 2016, where I taught several topics

2

during Special Agent Basic Training for new ATF recruits. Specifically, I was a primary instructor for the arson block of training at the ATF Academy.

5. During the course of my career, I have had trainings regarding the use of social media in relation to criminal investigations. Specifically, I have received instruction regarding the use of social media sites by criminal elements. Additionally, I have conducted previous criminal investigations in which internet research that I conducted yielded the use of social media by suspects. Specifically, I know from my training and experience that alleged suspects of criminal activity, who have accounts on social media websites, will often communicate their criminal intentions or past activity via "instant message" or "in-box message" on a given social media website. The "instant message" / "in-box message" is a private communication from one user to another. Furthermore, I know through experience that many social media users often use social media websites as their primary means to communicate with others. Additionally, I know from training and experience that suspects who use social media websites sometimes post photographs of themselves possessing incriminating items, such as large amounts of cash, narcotics and firearms. Also, suspects in criminal investigations have been known to post statements on social websites referencing their own criminal activity.

6. I have previously applied for and received search warrants related to the crime of arson, as well as other crimes.

7. Information contained in this affidavit was either obtained directly by me

3

or by other investigators who I believe to be truthful and credible. The facts in this affidavit come from personal observations, training and experience, and information obtained from other investigators and witnesses.

8.    This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Marcus Wilson has on his Facebook page and in his possession evidence of crimes committed in violation of 18 U.S.C. 844(i) (malicious use of fire), 18 U.S.C. 1001, 18 U.S.C. 1512, and Title 26 U.S.C. 5861(d), (e) & (f), (possess, transfer or making a firearm not registered in the National Firearms Registration and Transfer Record). There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

### IDENTIFICATION OF ITEMS TO BE SEARCHED

10.    The Facebook pages belonging to "Marcel M Wilson" - ID# 100000134569181 and "Marcus Wilson" - ID# 100012559444427, herein described as a personal website that is accessed with a username and password specific only to that page and further described in Attachment A. The following Facebook Page URL, Facebook Username, and associated Facebook Identification Number: The applied-for

4

warrant would authorize the search and recovery of evidence particularly described in Attachment B.

## PROBABLE CAUSE

11.    On August 13 and 14, 2016, Milwaukee experienced widespread arson, rioting, and looting in the area surrounding Sherman Park. The rioting and looting was, in part, a response to Milwaukee Police Officer Dominique Heaggan-Brown's shooting of Sylville Smith at the intersection of N. 44th Street and W. Auer Ave.

12.    Through an investigation into these arsons, the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives (hereinafter "ATF") discovered that several individuals, known and unknown and including Van L. MAYES, conspired and attempted to use Molotov cocktails[1] to firebomb the Milwaukee Police Department (MPD) District Seven Station located at 3626 W. Fond du Lac Ave. Milwaukee, WI, which is a building used in interstate commerce.

13.    On August 23, 2016, ATF was contacted regarding Molotov cocktails located within a dumpster at XX8X N. Sherman Blvd., Milwaukee. Inside of the dumpster, ATF Special Agents located a brown cardboard box holding ten glass bottles containing gasoline with a dark-colored fabric wick inserted into the openings. From training and experience, the agents identified these devices as Molotov cocktails. The Molotov cocktail bottles were labeled as Mike's Hard Lemonade, Everfresh Juice, Mistic

---

[1] A Molotov cocktail is a glass container or bottle that holds a flammable liquid, often gasoline. A wick is inserted into the container or bottle and then lit. The container or bottle is thrown causing fire to spread upon impact.

5

Juice, and Seagram's Escape Wine Coolers, which had been shipped or transported in interstate commerce.

14.    ATF identified Van L. MAYES as a person of interest; and on August 29, 2016, agents conducted a search warrant at MAYES' residence. In his residence, agents located Seagram's Escape Wine Cooler and Everfresh Juice bottles. These bottles were the same brands of the bottles that were used in the construction of the Molotov cocktails recovered by agents on August 23.

15.    On August 30, 2016, ATF agents conducted a search at an apartment located at XX8X N. Sherman Blvd. During the search, agents located evidence of Molotov cocktails: ripped dark-colored fabric consistent with the fabric found in the recovered Molotov cocktails; two partially empty gas cans inside of a bedroom; a gas can nozzle within the apartment's yard; a Mike's Hard Lemonade bottle; and Seagram's Escape and Mistic Juice bottle caps, which were consistent with the types of bottles used to construct the recovered Molotov cocktails.

16.    On September 20, 2016, ATF Agents informed MAYES that bottles that came from MAYES' residence may have been used to manufacture Molotov cocktails. MAYES said that the bottles came from his residence so his DNA would be on them. MAYES said that he drank from Everfresh Juice and Seagram's Escape bottles.

17.    From the investigation, ATF agents discovered that MAYES was a coordinator of "Program the Parks," which was an organization focused on mentoring for Sherman Park teenagers.

6

18.     Source of Information-1 (SOI-1) stated that a few days after the rioting on or about August 15, MAYES, C.E., C.M., B.H., and others met by the burned down BP Gas Station in Sherman Park and discussed firebombing the police station located at 3626 W. Fond Du Lac Ave. The group agreed to meet at the apartment located at XX8X N. Sherman Blvd. to further the plan. XX8X N. Sherman Blvd is approximately a half of a mile from the police station located at 3626 W. Fond Du Lac Ave. SOI-1 stated that MAYES brought gas cans and glass bottles to the location. MAYES, C.M., and Marcus WILSON. began to manufacture the Molotov cocktails. SOI-1 said some of the bottles were juice bottles, and there was a black coat that was ripped and used for the Molotov cocktail wicks. SOI-1 said D.M. acted as lookout while the Molotov cocktails were being manufactured. The finished Molotov cocktails were placed into a cardboard box. SOI-1 saw B.H. and others bring a bag of rocks to XX8X N. Sherman Blvd. B.H. was organizing Sherman Park teenagers and telling them about the plan to firebomb the police station. SOI-1 said the plan to attack the police station did not happen because C.M. thought too many people knew of the plan.

19.     In February 2017, Source of Information-2 (SOI-2) stated that on or about August 15, he was at XX8X N. Sherman Blvd., and there were approximately twenty adults and teenagers there. SOI-2 identified D.M. and a "large dude" as the people who were manufacturing Molotov cocktails when SOI-2 was there. D.M. asked SOI-2 if he would throw rocks at police so others could firebomb the police station with the Molotov cocktails. SOI-2 stated that the adults voted not to firebomb the police station

7

that night. SOI-2 saw the bag of rocks and the box of Molotov cocktails placed into C.M's car.

20.     In February 2017, Source of Information-3 (SOI-3) stated that on or about August 15, SOI-3 met B.H. to discuss some events that followed the evening of the fires. B.H. told SOI-3 that police recovered Molotov cocktails and gas cans from XX8X N. Sherman Blvd. B.H. told SOI-3 that they "covered up" the gas cans by saying that they were used for a generator. In July 2018, SOI-3 stated that B.H. contacted SOI-3 and stated that B.H. wanted to gather all the witnesses against MAYES in the criminal complaint and create a common story that protects everyone from prosecution. In July 2018, MAYES was federally charged with manufacturing Molotov cocktails stemming from his activities on August 15, 2016.

21.     In November 2016, Source of Information-4 (SOI-4) stated that after the shooting of Sylville Smith on August 13, SOI-4 heard MAYES say that Sylville Smith needs justice. SOI-4 stated that on or about August 15, s/he went to XX8X N. Sherman Blvd. with about twenty other adults and teenagers. While at the location, SOI-4 saw MAYES, C.E., and B.H. SOI-4 saw MAYES sitting next to a black fabric bag filled with rocks. Also next to MAYES, SOI-4 saw a box with several empty glass bottles. SOI-4 said that MAYES was wearing gloves and filling the bottles with gasoline, dipping ripped shirts into a bowl of gasoline, and placing the soaked fabric into the tops of the bottles. SOI-4 said some of the bottles were Everfresh Juice bottles. At this gathering, SOI-4 heard adults discussing a plan to firebomb the MPD district police station located

8

at 3626 W. Fond Du Lac Ave. SOI-4 stated that s/he and others drove by the police station located at 3626 W. Fond Du Lac Ave. and saw police on the building's rooftop. SOI-4 and the others went back to XX8X N. Sherman Blvd. and told the others that the police were ready for them. SOI-4 stated that because of the heavy police presence, the group decided against attacking the police station that night.

22.     In February 2019, Source of Information-5 (SOI-5) stated that on August 15, 2016, MAYES, WILSON, C.E., C.M., B.H. were at C.E.'s residence. SOI-5 saw MAYES pouring gasoline into glass bottles. WILSON told SOI-5 that MAYES had a plan. SOI-5 heard MAYES state that WILSON and "Bossman" would take children to MPD District 7 police station and throw rocks at the police as a diversion. MAYES then stated that while this diversion was occurring, MAYES, B.H., and C.E. would firebomb MPD District 3 police station and would later set fires in West Allis.

23.     Agents saw an August 14, 2016 Facebook conversation between C.M.'s Facebook page (ID # 100009020483652 - Identified as C.E.'s Facebook through photograph's and videos) and WILSON's Facebook Page, "Marcus Wilson" - ID# 100012559444427. In that conversation, WILSON's Facebook posted the following statement: "Shit I was ready to fight all that other shit im let them youngings tear that shit up. Im surprise no on try to RIOt the police station."

24.     Agents identified that both Facebook pages, "Marcel M Wilson" - ID# 100000134569181 and "Marcus Wilson" - ID# 100012559444427, appear to be used by Marcus Wilson. Agents compared pictures on those webpages to police booking photos

of Marcus Wilson and it appeared to be the same person. Agents further personally met Wilson in person and could identify him in the Facebook pictures in that manner as well.

25.     From the investigation ATF agents discovered that some of the youth who participated in MAYES' "Program the Parks" were present for the manufacturing of the Molotov cocktails and were asked to throw rocks at police.

26.     From electronic evidence recovered from MAYES' residence during the August 29 search warrant, ATF discovered several videos recorded by MAYES during the rioting on August 13 and 14.

27.     In Video 1 from MAYES' cellphone, he recorded himself during the civil unrest on August 13. During this video, a large group is seen in front of a line of Milwaukee Police Officers. In the video, MAYES is heard saying, "Where the rocks at? Who got the rocks?" and "Fuck you all! Punk ass cops. Getting they ass rocked!"

28.     In Video 2 recovered from MAYES' cellphone, he recorded himself during the civil unrest on August 13. In this video, MAYES has his face covered with a mask and is heard saying, "They killing their ass with these motherfucking rocks. Rocking their shit. Shit going down."

29.     In Video 3 recovered from MAYES' cellphone, he recorded a group of individuals who were damaging a police squad car during the rioting.

30.     ATF also viewed videos from MAYES' Facebook account.

10

31.     On August 14, 2016, at approximately 12:33 a.m., MAYES posted a Facebook video that captured MAYES walking near the intersection of Fond du Lac and Burleigh. In that video, MAYES stated that Milwaukee rioting "[T]urned into Baltimore. It turned into Ferguson. And it was necessary." In this same video, MAYES is heard describing the police district station located at 3626 W. Fond Du Lac Ave. as one of the "worst police departments, District Seven."

32.     On August 15, 2016, at approximately 7:12 p.m., MAYES posted a collage of photos to his Facebook page of Milwaukee Police Officer Dominique Brown Heaggan with the following statement: "Officer Dominique Brown Heaggan killed #SyvilleSmith. Yall know what to do...Let's get this out!!! #Fuckem #FTP." FTP is an acronym for "fuck the police."

33.     Further examination of MAYES' Facebook records showed that MAYES sent a private message at approximately 9:13 p.m. on August 15 to a person believed to be his sister, and the message stated, "Fa sho... Shit bout to get real tonight. Just so u know."

34.     Also on August 15, MAYES posted a video to Facebook at approximately 9:50 p.m. in which he announced to people walking near Sherman Park, "It's about to get real. Y'all are leaving. Y'all ain't going to see how real it's going to get."

35.     MAYES' cellphone records from August 15, 2016 show that his cellphone, at time that the Molotov cocktails were being manufactured, was utilizing a cell tower that provided coverage in the area of XX8X N. Sherman Blvd.

36. A Molotov cocktail is a destructive device and a firearm.[2]

37. Your affiant believes additional information relevant to federal arsons and related crimes is housed within the Facebook accounts of "Marcel M Wilson" - ID# 100000134569181 and "Marcus Wilson" - ID# 100012559444427. Additional relevant information includes pictures, videos, text, and geographic information that will assist in identifying the arson suspects and criminal activity.

## FACEBOOK INFORMATION

38. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

39. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone

---

[2] Under 18 U.S.C. § 921(a)(3, 4), the definition of "firearm" includes a "destructive device", which includes: "(i) any explosive, incendiary, or poison gas (ii) bomb, (iii) grenade, (iv) rocket having a propellant charge of more than four ounces, (v) missile having an explosive or incendiary charge of more than one-quarter ounce, (vi) mine, or (vii) device similar;... and any combination of parts either designed or intended for use in converting any device into a destructive device...."

12

numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

40. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

41. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

42. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status"

13

updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

43.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

44.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles

14

of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook.  These chat communications are stored in the chat history for the account.  Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

45.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

46.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

47.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

48.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

49. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

50. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

51. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

52. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

53. Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for

16

the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

54. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

55. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

56. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any

17

payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

57. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining

18

the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

58. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND ITEMS TO BE SEIZED

59. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using

the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

60.     Based on the forgoing, I request that the Court issue the proposed search warrant. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court of the Eastern District of Wisconsin is a district court of the United States that has jurisdiction over the offense(s) being investigated, 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

# ATTACHMENT A

*Property to Be Searched*

This warrant applies to information between January 1, 2016 and the present date associated with the Facebook accounts "Marcel M Wilson" - ID# 100000134569181 and "Marcus Wilson" - ID# 100012559444427, that are stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.

## ATTACHMENT B
## Particular Things to be Seized

**Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

a. All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

b. All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

c. All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

d. All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook

group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e. All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

f. All "check ins" and other location information;

g. All IP logs, including all records of the IP addresses that logged into the account;

h. All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

i. All information about the Facebook pages that the account is or was a "fan" of;

j. All past and present lists of friends created by the account;

k. All records of Facebook searches performed by the account;

l. All information about the user's access and use of Facebook Marketplace;

m. The types of service utilized by the user;

n. The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

2

o.      All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

p.      All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

**Information to be seized by the government**

All information described above that constitutes fruits, evidence and instrumentalities of violations of violations of 18 U.S.C. 844(i) (malicious use of fire), 18 U.S.C. 1001, 18 U.S.C. 1512, and Title 26 U.S.C. 5861(d), (e) & (f), (possess, transfer or making a firearm not registered in the National Firearms Registration and Transfer Record), since January 1, 2016 to the present, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) The relevant offense conduct;

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including

3

records that help reveal the whereabouts of such person(s).

(e) The identity of the person(s) who communicated with the user ID about matters relating to relevant offense conduct of the above-listed crimes, including records that help reveal their whereabouts.

(f) Based on the forgoing, I request that the Court issue the proposed search warrant based on the aforementioned facts.